Good morning, Your Honors. May it please the Court, my name is Jim Dasso, and I'm one of the lawyers representing International Marine and International Offshore in this case. As the Court knows, this is a case involving a warrant of a substantial amount of liquidated damages, about $8.25 million, plus another $4 million in pre-judgment interest on those liquidated damages. It's our belief that the trial court did not address and did not make correct decisions on both the imposition of liability and the calculation of the number of incidents and the award of pre-judgment interest. We raised five issues on appeal. It is my intention to kind of go backward in the ways we raise those in our brief. Obviously, I will answer any court or be subject to be redirected by the Court at any point in time. The first issue that I wanted to discuss was the pre-judgment interest issue. In our view, it was improper to award pre-judgment interest on liquidated damages. And in support of that, we point to the Montelego decision of this Court and the Marshall decision out of the Seventh Circuit. Both make clear that the basic purpose behind the award of pre-judgment interest is to compensate a plaintiff when there's been actual damages. In other words, to basically address the time value of money issue. And that when you have liquidated damages, which are just basically an estimation of damages before there's even any events, the basic purpose behind an award of liquidated, excuse me, pre-judgment interest does not exist. I think the Seventh Circuit said it well when they said liquidated damages are at best a rough guess of what the damages are and there's no reason to believe that you get any better of a rough guess if you award pre-judgment interest on that. So we believe it's a matter of law based upon those decisions and the other decisions that it was inappropriate to award pre-judgment interest. As a matter of fact, as well, Your Honors, we believe that it was inappropriate. If you just look at the circumstances of this case, I think the cases, as we argue, shows that there was no actual damages here. Nevertheless, the Court awarded $8.25 million in liquidated damages. And we'll get to whether that was appropriate or not. But even if it was appropriate, there's no indication at all on the factual record of this case that we needed to add another $4 million on to make Delta Toe and Ho. I would suggest to you that the $8.25 million award in the beginning was a windfall and the $4 million is just a windfall on a windfall. Unless there's questions on that, I was going to turn to our second issue. The second issue was the award of liquidated damages for late or incorrect payments. Again, there was five payments in particular, and we put those out on our brief, where there was an award made of $250,000 each for late or incorrect payments. One payment was only $105 short of what it should have been, and the District Court awarded $250,000 in liquidated damage. Another payment was only $340,000 short and another $250,000 was awarded. One payment was 15 days late, $250,000. Another was 19 days late, $250,000. We presented in our briefs the authority that says you should not award liquidated damages on late or incorrect payments of money. The basic rationale behind liquidated damages, which is you don't know how to calculate damages, they're going to be difficult to calculate, does not apply in that situation. And I think that the authority that we suggested says it's almost uniformly agreed that that's the point of law, and there's been no other authority cited. But if you take off the prejudgment interest and you take off the punitive damages for the liquidated damages, I should say, for the late payments, what are you left with? Then you'd be at $7 million, Your Honor. Okay. Now, you concede that you owe the $7 million? We do not, Your Honor. We've raised three other issues. One issue goes to the calculation of the number of awards of liquidated damages. What's wrong with that? When you strike a bargain and it's plainly aimed at trying to do we want to put these bards into commerce against ourselves? Do we want to end the enforceability that I put to one side? But that's what you're trying to do with this agreement. And there's a lot of the unknown out there as to what you do and you don't know. So it's agreed that this is what the law will be, but it's very difficult to prove. And that's why you get these kind of agreements. But then you sound on to that and what's wrong with that now? Why is that really unenforceable? Your Honor, it's not our suggestion that it's unenforceable other than those two issues. We believe the Court decided that issue on appeal last time, that this is an enforceable contract. I thought so. So we're only talking about the prejudgment interest and the late payments? I disagree, Your Honor. We raised three other issues and I think that those are separate from whether or not you have an enforceable contract or not. The three other issues we raised are number one, we believe we complied with the plain words of the contract. Number two, we believe that this is an extreme case and that was specifically carved out of the last decision. And number three, we believe the Court below miscalculated in terms of several voyages of vessels. And in particular on that third point, Your Honor, I think that's really important as well because the Court actually for two instances where there was a one vessel hired by one client and went out and there was two invoices issued, the Court said, well, that's only one occurrence. And that was, there was a charter out to Smith Marine from April 27th to May 1st, 2007. Two invoices were issued. The Court has said one occurrence. Smith Marine also hired the skipper from June 28th through July 5th. There was two invoices issued and the Court said one occurrence. But then the United Tugs hired the vessel, the skipper, for a day and a half. It went from about 11 in the morning on one day on June 15th to 10.30 in the evening on June 16th. And the Court said that's three in different instances or occurrences. So that day and a half voyage for one client is all of a sudden goes from $250,000 to $750,000. No explanation about why or why that was different from the other two instances where he did something different. And I point out the invoice numbers that are out there are consecutive invoice numbers. So clearly it was done for the convenience of the client and that was the testimony in the record below. So we believe that also, again, Your Honor, even if the Court believes that we violated the contract, I believe that it was inappropriate to award multiple awards of liquidated damages for that one voyage. And at the very least, it should be remanded to the District Court to explain why that's different from the other cases where you said, no, no, it's only one voyage even though you issued two invoices. We make that same point with respect to another case, 2006 through January 2007. Again, that's laid out in my briefs. And so I won't report the details of it. But again, our view is if you have one voyage for one client for one vessel, that should be at most one incident or occurrence because there's at most one time when we didn't... Why isn't that a fact question? I think in the end, it is, Your Honor. But I think what we have in this situation is something where it appears from what we have in the record that the Court applied a misconstruction of the agreement. Now, I understand that it's sometimes hard to understand exactly what the District Court's thinking, and particularly in jury trials, you give a large berth. But in this situation where this is something we raised specifically in the District Court and said, Judge, this is, you know, there's only one occurrence here or only one trip out, I think we at least should be entitled to an explanation from the District Court judge as to why that's different when he did something different before. I think to the extent it's a fact question, it's a fact question that's not laid out in the record. And at the very least, it needs to go back down to Judge Fallon to have an explanation on those points. We believe, however, that this Court can, and we've cited information in our briefs where if there's a construction of the contract, which is a legal issue, and undisputed facts, which I think is the case here, then the Court can make the decision without remanding it to the District Court. And here we have a legal contract, which says incidents or occurrence, and we have a very clear undisputed facts, which are it was a single voyage for a single client over consecutive days. It seems to me that that is enough for this Court, doesn't have to send it back down. I'm now going to turn to the fourth point we make, which is the extreme case point. Again, this was specifically carved out of the earlier decision by this Court. Well, it depends on how you read that footnote. I would agree, Your Honor, that that is what is suggested by the plaintiffs. But, I mean, the footnote does say we declined to decide. So what that says is there was no decision made on that point. Well, no, it could mean that you didn't give them enough to decide it on, which would mean it's over. We're not going to sit there and say this is an extreme case because what you've given us doesn't show us that. I would not read it that way, Your Honor, but I understand ultimately it's your reading that is the relevant one here. I would suggest that's not the appropriate way to do it because extreme case in part depends Well, the Court knows it's sending it back. It would seem like if you're carving something out, if you're doing a need not decide on a final judgment that's not going back, maybe you don't need to be real clear. But if you're sending something back to a district court as an appellate judge, you've got to be clear about that. And I don't see a clear carve out like on remand the Court can consider this and that. There's none of that. So that's why I'm saying it doesn't seem to me to be a clear carve out. I understand how you're reading it, but I don't see it as a carve out when you know you're sending it back for there to be a trial. I would say, Your Honor, one of the basic tenets of the law of the case doctrine is that decisions should be made on the merits of the various issues here. I think if a court says we're not deciding this issue and there's additional facts developed in the district court and then it comes back up, I think this Court certainly has discretion. What were the additional facts? We had, what we had, Your Honor, is we had the evidence from Mr. Mathurne and Mr. Vorce, which were in the original appeal. But then we also presented evidence from Delta Towing indicating that they really made no effort whatsoever to put out the vessels for, to be chartered. There was an admission that when they got the information about the vessels in, they put those information, they had an availability list, okay, here's all the Delta Towing vessels we have available. They put that, the international boats at the very bottom of their list. And they focused on doing their own boats. They said, I think Mr. Mathurne was very honest about that point. He said, look, we'd rather earn 100% of the amount of the charter rather than just be given 10%. So if we had a charter opportunity, we put our own boats out there. And he was also very clear that he never made any effort to really market these boats. So I thought that the whole point of the liquidated damages wasn't just these boats, qua these boats, but the competitive impact of putting these boats out there to compete against. And so that that was part of the concern, not just getting income from these boats, but that these boats then compete. Is that not? I think that was certainly part of what the court said in the first decision is, is that what you're protecting in a non-compete provision is the competition itself. And so that doesn't, to me, the fact that you don't want to necessarily charter this boat doesn't have anything to do, in my mind, with whether you're concerned about the competition of this boat to your boat. Well, Your Honor, I would agree with the court if it was a straightforward sort of a non-compete provision with no exemptions. Here, the exception was pretty clear. And that is, if we give you the boat and offer it to you and you don't do anything with it, then we get to go charter it. So it wasn't. And then we have a debate in the case. You guys have a debate about whether it really was offered and, you know, you have that first call, but then they don't really ever offer it again and blah. I mean, I get that. But to me, that is a little bit different from saying that the only metric of whether they lost anything is whether they would have used the ship, this boat or whatever itself. I would suggest, Your Honor, to the extent that the driving force behind this is the prevention of competition, they had two alternatives. They could either use our boat and then prevent the competition or not use our boat. If they didn't use our boat, then we got to do it. So as soon as they decided not to use our boat... No, I mean, because if you're the only ship in town, that's different from you've got another ship going out there competing with you. Agreed, Your Honor. So then I realize this is more than that, but... But I'm saying they did not have the right to be the only ship in town. No, but they had the right to not have you guys compete. No. Without at least knowing about it. They had the right to charter the boats, and if they didn't charter them, then we could. So they could not prevent us from competing for any significant period. All they could do is say, we get a chance to charter the boats before you go out and try to charter them for others. I want to jump last to my last point, and that is we really do believe, I mean, I remember we got in the case, Mr. Phillips and I, towards the end of this case. And when I read the saying, we did exactly this, we offered them the votes, we made both offers, and those offers were made, and they did nothing to lease the boats out. I think we comply with the plain words of the contract. Thank you, sir. Mr. LeBlanc. Good morning, Your Honors. Bill LeBlanc for FDT Delta Towing. I'd like to hand you, Your Honors, if I could approach the bench, a copy of the breaches chart. Would that be okay? For future reference, this isn't how you do it, but you give it to the clerk in advance. And this just, if you look at the first column, it leaves out the 33 breaches, and then it matches up the international job numbers for each of the 33 charters. You can see in the third column there that we're not talking about invoices, as international indicates. We're talking about international job numbers. There was an email produced at trial from Mr. Chason, who is the person at International in charge of implementing the VSA with respect to these tugs, and he explicitly explained that at International, internally, they assigned a job number to each charter and that they were separate agreements. He specifically said that. If you look, International tries to make some hay about the numbers, the job numbers. If you look at breaches 1, 20, and 32, you'll see that they put subparts A, B, and C, or they'll put a designation under 20 of A and a designation under 32 of another 1. And Mr. Valdez, who is the only international witness, related witness, produced at trial, confirmed that this chart was accurate. He said this chart was 100% accurate when he compared it to an earlier chart he had done for International, which the Fifth Circuit and the District Court had reviewed during the interlocutory stages. And he said this was the accurate representation of the underlying documentation, which are joint exhibits 1 to 38 in the trial record. If you look at those exhibits, there's backups in the form of, and a couple of them, charter agreements, where the job number will match up with a charter. So you can tell from things like master boat logs and invoices and things of that nature what a charter was and what it wasn't. So I just wanted to give you all that if you wanted to have any questions about it or follow that. As your honors have pointed out, this case was decided on MS enforceability, and we say liability. Judge Fallon and Judge McNamara say liability. We don't. During a motion for summary judgment stage and then an interlocutory appeal to the Fifth Circuit, Judge Fallon issued a 45-page opinion. In their brief, International contends that that 45-page opinion, the 20-page opinion from Judge Fallon on a motion for reconsideration, and then the Fifth Circuit's opinion, reviewing de novo those previous opinions, only facially reviewed the enforceability of paragraphs 11F and 11G of the VSA. We find that's completely unsupported by the record, by a review of Judge McNamara's motion for summary judgment, by a review of the Fifth Circuit's opinion. Judge Fallon himself even recognized that in his motion for reconsideration that Judge McNamara had, in his 45-page order, had set forth the undisputed factual background of the parties, the VSA, and the course of performance in great detail. This wasn't a case where the parties attached the agreement and they made public policy arguments about the language, manner, or didn't. Judge McNamara relied on expert testimony about charters out, the lengths thereof. International, in their own briefing, admitted that a charter could be for three hours or for three years. I don't know that there's really any legal dispute in the record about what a time charter is. We contend that most of what International argues on appeal is the law of the case. Judge Stewart, Chief Judge Stewart, wrote an opinion on the interlocutory stage, again, reviewing those previous motion for summary judgment order and motion for reconsideration order. I'll go through, you know, I can go through the fact that, you know, even Judge Fallon himself found that the Fifth Circuit decided the issue of waiver. They decided the issue of extreme case. If you want to talk about that, I mean, frankly, Delta agrees with the reading that Judge Haynes is suggesting that they found in this case. Keep in mind that the restatement exception of an extreme case hadn't been adopted by the Fifth Circuit. So, what we think the Fifth Circuit respectfully decided was they don't need to decide, based on the facts of this case, whether or not the Fifth Circuit's going to apply or not apply the extreme case exception, because in this case, the only evidence. There was no evidence that there was damages. There was no new evidence at trial about that. They had the testimony from Mr. Matherne. They had an affidavit that they drafted for Mr. Matherne, and they had that testimony from Mr. Vorce. There was absolutely nothing new at trial about the damages of Delta. So, respectfully, we don't think the Fifth Circuit needs to go into that. Judge Fallon, after trial, he independently decided the number of— Let me ask you this. If we were to reach the extreme case question, what do you make of their argument that there were no damages because they weren't going to charter these boats anyway? I think Your Honor already knows the answer to that. This was a non-competition agreement, flat out. That was decided by Judge McNamara, by Judge Fallon, and by the Fifth Circuit. They all say the same thing. Paragraph 11-F is a non-competition agreement. Right, but it was non-competition in the sense of we get the chance to use these boats ourselves and, in essence, get the full benefit, but not that you can't use them. So it's not a full non-compete. Essentially, we get the first dibs on it. So if they had no plans to charter these boats, they couldn't prevent International from using the boats. So there would be the competition anyway. They could, Your Honor. They had the right to charter it themselves. But if they're not doing anything to charter it— Well, the purpose—they bought the boats. International bought the boats to use them internally. At first, they came to Delta, Steve Williams, the CEO of International, and said he wanted to buy these tugs. And they told him, no, we're not going to sell these tugs to you. You're our competitor. You're going to use them in the Gulf of Mexico in the same business that we're doing. We don't want to sell these to you. Whether or not we were using them or not was pretty much immaterial. They had other boats that were servicing these customers. So there was multiple rounds of negotiations. The liquidated damages provision started off at $4 million per. They negotiated it down. The $250,000 was eventually a number thrown out there by International and was accepted. The record shows that International would not have sold these tugs to them at all without this non-competition agreement with the provisions in there. It required— Delta. Delta, sorry. The pre-charter obligations, which are—the exceptions to the—we view it, and we believe the two district court judges in the Fifth Circuit view it as a non-compete provision with exceptions. If you follow these exceptions, then you've not violated the non-compete agreement. There's pre-charter obligations and the post-charter obligations, which are the payment obligations. The pre-charter obligations are, number one, you have to let us know when they're available to be chartered. Although, you know, when they first bought them, they were doing some refurbishment work to them. And then they sent an email saying, hey, you know, they're available to be chartered out now, saying that the refurbishment work was done. And it's International's position that those emails, those one emails for each vessel, satisfied their obligation to let Delta know that the tugs were available for the next five years, which makes no sense in terms of the fact that this was a non-competition agreement. They also had to offer the available vessel to Delta so that Delta could enter— How does this help us understand if it's an extreme case? Well, I was answering your question about competition. You said how—I think you were asking me how these exceptions relate to competition. And it's not just let us know that they're available. It's you have to offer it to us on each instance to see whether we wanted to charter itself. And then they have to get our acceptance of the charterer. And that's key because we need to know who you're chartering it to. And they said, well, we told you at one of the charters was United Tugs, and so you really shouldn't be able to complain about that. But the undisputed testimony at trial was in the vessel brokering business in the Gulf of Mexico. The acceptability of a customer, for various reasons, could change over time. There was nothing that International introduced to dispute that. Mr. Mathurin said, you know, that was his experience, his very experience in the vessel brokering business. So they told us, you know, nine months lapsed between the time they used them once and the time they used, you know, the last time they used them. And then they had to agree on higher rate and duration. And those take up various competitive factors as to what your competition is charging with tugs that may be similar to yours in terms of a rate. So I don't know if that is true. I think I was saying Judge Fallon, after trial, determined that there were 33 charters out in violation of both the pre-charter obligations and the post-charter obligations. He found for each one of them specifically, he went through each of the 33 charters and explained which ones there were, said they all violated the pre-charter obligations, said they all violated the post-charter obligations, and applied the liquidated damages as was his mandate from this court. He did reference the fact that the Fifth Circuit and Judge McNamara had found that International had conceded that there were at least 27 breaches of the VSA of paragraph 11F in the spreadsheet that Mr. Valdez, their CFO, had created. And they had produced in discovery and again was attached as an exhibit to an MSJ. Judge Fallon never made any indication that he was mandated to find at least 27 breaches. He did an independent investigation of how many charters there were. But certainly it was the spirit of this court's ruling, which is part of the law of the case, that the charters, how many charters out there were, and the fact that there was an incident or occurrence per each violation of a charter out by International of paragraph 11F should be found to trigger the LDs. And that's what he did find. We would also submit that it was the law of the case that paragraphs 11F and 11G are clear and enforceable under the facts, that 11F was a non-compete agreement with limited exceptions. The pre-charter and post-charter obligations, again, as I mentioned, those are specifically spelled out by the Fifth Circuit by Judge McNamara. The fact that they trigger LDs, again, spelled out by McNamara and the Fifth Circuit. That International's separate job numbers indicated separate time charters, again, that was on issue and argued on appeal. Decided law of the case, the no actual damages issue on the number of breaches. Went through this a bit. Went through the pre-charter obligations. The law of the case, again, is that International argued on appeal and at the MSJ stage that they shouldn't be liable for liquidated damages for late, insufficient, incorrect payments. And that's what they're still arguing today. We would submit that's the law of the case as well. In their brief, International tries to say they didn't have the pre-charter obligations, at least the requirement to notify Delta that the vessels were available each time they did a charter going through that a bit. We think they have a rather strained interpretation of what the defined term, covered term applies to that clearly defines the five-year term of the non-compete provision and doesn't reference the efficacy of one email notification to eliminate key pre-charter obligations going forward. There were 33 charters out, as your honors can see on this spreadsheet. Numbers 6 through 33, International didn't do anything. They just chartered them and didn't tell Delta about it. This was right after Steve Williams, who was the CEO of International, contacted Delta and tried to reduce the payment rate owed, the 10% rate. And he expressed displeasure with the rate and International said, no, we're going to stick with that rate and we're going to stick to the terms of the VSA. And it was right after that, that they went silent. And per the agreement, the agreement specifically says the vessels are being Delta just rightfully assumed that they didn't want to charter them anymore and they were using them internally and not competing with Delta. Well, turns out they were using them to the tune of 28 charters, which Delta got wind of later in the business and sent an audit request via a letter, which was ignored, followed up. It took a couple of months to get an audit, which happened in Exhibits 1 through 38 in the record, Joint Exhibits from Trial, which again, showed the backup for all these invoices. And then shortly after, sent a demand letter for the liquidated they actually have, this goes to internationalist arguments that the job numbers weren't charters or there were only so many charters. There was actually a charter agreement that says charter agreement and has the job number on it. The ones that I showed you all that your honors, that was 1, 20 and 32. The ones that had sub identifications for a particular job number where invoices were sent under those subcategories, sub numberings, those were ones that went over to the next month. Mr. Valdez, who is the CFO of international, testified at trial that the only reason that these were given these additional related numbers was that so that they didn't go over the month in invoicing. They wouldn't wait three months to invoice. The other ones that international are talking about that had different job numbers, wholly different and unrelated job were separate charters. United Tugs and Smith Marine were tug brokers similar to International and Delta and they would supplement their fleet by chartering out these vessels from International or Delta or whomever. And both International and Smith Marine and United Tugs would separately charter out the vessels to an end customer and it was the practice of all these companies as backed up by the backup evidence to assign different job numbers. They were different charters factually and legally. There was some, a trial, they kind of abandoned this point before your honors, but a trial they tried to argue that the different charters to United Tugs and Smith Marine were part of master charter agreements which we couldn't find, no one found in the list. Those individual charters as I'm sure your honors know under a master charter agreement remain individual charters. On the prejudgment interest issue, under a maritime contract, an award of prejudgment interest is reviewed for an abuse of discretion. Under maritime law, prejudgment interest is the rule rather than the exception and is essentially automatic. Delta is not the one proposing an exception here, International is. In order to fall under an exception to that rule, you have to show peculiar circumstances. The only one arguable, you know, that they'd have any chance of meeting here would be that there was some equitable doctrine that would caution against the award. There's no Fifth Circuit case in the, that says liquidated damages can't be awarded, I mean, prejudgment interest can't be awarded for liquidated damages under a contract in a maritime case. Simply not the case. In real tubing, which is a Fifth Circuit case. Do you have a case that says they can? Say again? Do you have a case that says they can? Not directly on point, your honor. In real tubing, for example. You're saying that we just haven't addressed that issue. As far as I know, your honor, you haven't. But the policy behind it, I guess, is set forth in a Fifth Circuit case, real tubing, which says prejudgment interest is proper to ensure that the injured plaintiff is compensated for the use of funds to which plaintiff was entitled, but which defendant had use of prior to judgment. Well, that's pretty clear here that these were clear violations which were demanded, LDs were demanded in February of 2009, and why should they get to keep a substantial amount of prosper off of it? I see that I'm finished, so. Thank you. Mr. Doss? Thank you, your honor. I just have a handful of points to make. First of all, I wanted to follow up on a comment that Judge Haynes made right at the end of my presentation that I wasn't able to answer because of the time limits. Judge Haynes suggested that there was a dispute between the parties over whether the vessels were offered. I do not believe that that is correct. I think it's clear that the vessels were offered. We put into evidence emails where they were offered. Mr. Matherne, who was the general manager of Delta, said, yes, you offered them to us. The dispute in the contract is what was the impact of that offer. Did we have to then re-offer them every time we were going to go into a new charter or do something new? Well, that's a dispute about the offer. It's a dispute about the construction of the contract, I think, your honor. And that, is whether it's a factual dispute or a dispute that this court can decide as a matter of law. And I believe it's an issue that this court can decide as a matter of law. It says, because if you look at the agreement, the agreement says, if you offer them, and if the seller is, I'll read it, if the seller is unable to secure charters out for the vessels within a reasonable time of the vessels becoming available, buyer may charter out either or both of the vessels at fair market rates directly to charter customers for use in the covered trade during all or part of the covered term. So it says, if you offer them and they don't charter them out, then we have the right now to directly charter them out during all or part of the covered term. I mean, that's the language. That's the language in the contract. And to go to Judge Higginbotham's point, it's fair that we live up to the contract. But if we did live up to the contract, then it's not fair to award $7 million or more in liquidated damages to us. And we made the offer. I don't think that's disputed. And I think the contract's pretty clear as to what the impact of that is. There was a suggestion that somehow we needed to get advance approval of rates, customers, those sorts of things. That's not, again, not what the contract says. The contract says they just need to be reasonably reasonable. And again, there's no dispute that any of the customers that we lent them to or any of the rates or any of the durations were inappropriate. So I don't think that that's an issue. So again, I think if this court applies the plain words of the contract, we did what we were supposed to do. And therefore, we had a right to let these out for all or part of the covered term. That's what the contract says. A couple more points in my remaining time. There was a suggestion that Brian Chason said something about this in the case. Mr. Chason needed to testify in this case, either in deposition or testimony. So there was nothing about the job numbers that he said. The question about what happened on the previous appeal, he said it's all law of the case. I would just direct this court to Judge Fallon's 54B certification, where he says I'm just certifying these issues, these issues being the enforceability. And he goes out of his way to say they're separate and distinct and the facts don't overlap from the issues we're raising on this appeal, which are liability and damages. He said there was absolutely, I'm quoting, absolutely no new evidence about damages. I don't think that that's correct. The evidence that I talked about on my earlier argument was new. These guys didn't make any effort to put the boats out there and that was their choice. They either had to put the boats out there through them or let us do it. They didn't have the choice to keep out you talked about the number of job numbers and charters and all the rest of this stuff. Again, I direct the court back to the contract. The contract says you award liquidated damages per incident or occurrence. I don't think there's anything that suggests one incident or occurrence is where you let one vessel to one entity for one voyage. I don't care how many different invoices you get out of that. It's just one incident. Or at least Judge Fallon should have explained why it was more than one incident and I think it should go back to Judge Fallon for that explanation. Mr. LeBlanc said that the job charters for the one or the charter numbers for the ones that the judge didn't award as one incident were totally unrelated. I think he said wholly different and unrelated job numbers. That's not correct. They're consecutive job numbers if you look at them and again those job numbers are in our brief. And then finally I would end with a point that Judge Higobarton made and that is there is no case out there that has ever upheld the award of prejudgment interest on liquidated damages. They tried to cite one and as we indicated in our brief that was just loose words by the court out in New York City. What the actual award was there was they were awarding shipping charges and they were actual damages that weren't paid. So I would suggest to the court that there is no precedent at all for what happened here and the court's decision in Montelego concludes it. Thank you.